All righty, we're back on the record. And next case is Public Interest Legal Foundation versus Secretary Commonwealth of Pennsylvania. Numbers 23-1590, 23-1591, and 23-3045. We'll hear from counsel. You may proceed. Thank you, Your Honor. May it please the court. My name is Donna Walsh, and together with Dan Breyer, I represent the Secretary of the Commonwealth, Al Schmidt, and the Deputy Secretary for Elections and Commissions, Jonathan Marks. I respectfully request three minutes for rebuttal. That'll be granted. This case is about an out-of-state litigant with no Pennsylvania members trying to access personal protected information about people on the Pennsylvania voting rolls to investigate whether they belong there, to decide for itself whether they belong there. Now, before I get to why PILF's arguments fail on the merits, standing is a threshold problem. PILF was an Indiana entity when the case was filed. It's now headquartered in Virginia. It has no Pennsylvania members and does not represent or have a relationship with Pennsylvania voters. It was not affected by the PennDOT software error that led to the request for records in this case. Its only claimed interest is an interest in monitoring the election process, monitoring election integrity. And that is not sufficient. Well, let's talk about this a little bit. I suppose if this were in an earlier year, that is before TransUnion was decided, we might have, I guess, more clarity here, I suppose, if that case didn't exist, but it does. Problem is that we're dealing with a public disclosure statute. And is this, are you arguing for too sort of high a hurdle for anyone to meet? I mean, I read our Kelly opinion. I was struck with and had a good thought. Look, if you don't have the information, you don't know what the information says, you can't concretely say, here's what I'm gonna do with the information. Sort of a circular type argument. How should we approach this? Well, TransUnion changed everything. And the motion, the standing issue was decided on a motion to dismiss before TransUnion came out. And TransUnion makes crystal clear, no concrete harm, no standing. Of course, that's what Article III requires. But TransUnion also makes clear that a mere statutory violation isn't enough. And that's all that's alleged here. That's all that's alleged here. Sorry. That PILF made a request for information and it didn't receive it. And that affected its mission. Because its mission is to ask for records and to advocate about it. Well, you're short-circuiting their mission. Don't they also, I mean, there's some materials here in the record. And part of what they do is they propose solutions to this problem. And the whole point of the NVRA is to make sure that the roles are accurate, correct? So if they propose solutions, do things to make it accurate, why wouldn't that be, and they're prevented from doing that because they can't get the records. Why wouldn't that be a harm that's concrete, that's related to the purpose of the statute? Because that's a generalized harm that affects the public generally or that can be claimed by the public generally. It's been a longstanding precedent holds that mere interest in an issue, an organization's interest in an issue, is not sufficient. No matter how longstanding, no matter how sincere, no matter how qualified the organization is to make recommendations or to make suggestions. But they're saying it's not just an interest in the issue. They want to propose solutions to this problem. The problem has to do with the accuracy of the voting roles. So why isn't that really the harm that is related to the purpose of the statute? Which is, again, what we said in Kelly, there has to be those three things. And it's the third. Why isn't that enough? Well, because it doesn't meet the second part, which is the downstream consequences. There's no adverse effect or downstream consequences from not having the information. As you said, the Kelly test is a three-part test. The first part is you don't have the information you're entitled to. The second part is you've suffered a downstream or an adverse or a concrete harm from not having the information. And that's all that's alleged here is we ask- An example would be if there were a registrant who was harassed in some way by these letters that went out back in 2018. And if the person was harassed because of the letters, they might be in a position to allege concrete harm to request information about the letters. That harm to the person, the person who received a letter and suffered harassment, that would be some type of concrete harm. But again, going back to the Sierra Club case, and as recently as this summer in FDA versus the Alliance for Hippocratic Medicine, the court said mere setback to an organization's abstract social interest isn't enough. And respectfully- But to me, the fact that they want to propose solutions is more than an abstract interest. When the purpose of the statute is to assure that it's accurate, and they want to help make it accurate, and yet they're being prevented from doing that. If that were the case, though, Your Honor, then every person in every organization would be able to ask for records to pursue its own interest because it has an interest in talking about it or advocating about it, and they'd have standing. And that's just not how articles- But isn't it a little bit more here? I mean, sorry. Go ahead. I'm sorry, Judge Roth. The purpose of the statute. Well, the purpose of the statute, according to the court in the American Civil Rights Union case, the purpose of the statute is to protect the right to vote. The NVRA, according to this court in that case, the purpose is to act as a shield to protect the right to vote, not to act as a sword to pierce it. The statute's intended to enlarge voter participation and voter registration and voting, and to prevent states from taking steps through mechanisms, improper mechanisms, from removing persons from the rolls. And that didn't happen here. So enlarge versus remove, are they consistent? Well- The statute is to enlarge, and the organization is to remove. Are those two consistent aims? I don't believe so, especially here, where the statute defines specifically what states must do to allow persons to register. The NVRA also puts limits on what states can do to cancel registrations. And there are specific circumstances where cancellations can occur, and there's no possibility under the statute. The statute does not allow states to cancel registrants based on mere suspicion of non-citizenship, or mere suspicion that qualifications aren't satisfied. And the Commonwealth did not do that here. The Commonwealth did not cancel any registrations. It did not adjust the voter list. And that's why we contend that the statute wasn't meant to apply in these circumstances, where persons weren't added or removed. And it would be a perversion of the statute to take a statute that's intended to encourage voting, and to allow organizations or persons to request records, to do their own investigation, and to argue or to try to pierce those voting rights. So would you say that accuracy of the voter rolls is not a purpose of the statute? Or is it a purpose or not? It is a purpose of the statute. But again, with an eye toward encouraging voter registration and encouraging voting. And we contend that the standing argument here fails on the subtle principle, the subtle premise, that generalized interest in proper administration of a law isn't enough for standing. And respectfully, there's nothing about a public disclosure statute that changes that. Again, TransUnion said no concrete harm, no standing. Can I just ask, when your adversary did get information, as Allegheny County gave them information, they did produce a report, which you've seen, we've all seen it. I mean, does that move the needle at all in terms of abstractness versus concreteness? I don't believe so. Again, we go back to what the Sierra Club case said years ago, that no matter how strong an interest, it doesn't give rise to standing. There has to be some negative consequence to the person that flows from not having the information or not having those rights respected. And that just doesn't exist where an organization on its own decides a mission and decides to do something. I get it, but what about the report? The report evidences that once they do get information, which they did under the NVRA, they will do something with it. But they can't very well tell us, we don't know what we're getting, but we're gonna do something with it. I mean, it's just, it's a tough burden. Well, it's a speculative problem. Just say, well, we wanna do something in the future, we can't tell you what it is, or maybe we'll write a report, maybe we'll find something. That's another standing problem. It's not particularized. But just as recently as this summer in the FDA case, the court said, again, a setback to an organization's mission isn't enough. Because otherwise, anybody would be able to establish standing just by having an interest and spending money on it, and that's not enough. Not after TransUnion, not after Kelly, not after the recent decision in George versus Rushmore Services. There needs to be some adverse consequence, and it's not enough to say, I would have done something with the information had I gotten it. Because anyone, anyone could establish standing. Any organization could establish standing under those terms. So our position is PILF has not made out standing, and the case should be, the judgment flow should be vacated and the case remanded to dismiss for lack of standing. But even if PILF had standing, it's not entitled to the information that it's seeking. And there's two categories of information. First are the names and addresses of people to whom letters were addressed, and who have never been determined to be non-citizens. And the second is a consulting experts analysis work product. And we contend that that information, it's not within the scope of the NVRA. It is information that's protected by the Federal Drivers Privacy Protection Act. Because that analysis, because that information, because the letters were derived through review and analysis of the driver license database, that information, it's derivative, it's protected, it's something that can't be turned over without violating federal law. The work product doctrine squarely applies to the experts analysis. Isn't that it's protected from being turned over by the Division of Motor Vehicles, but the fact that independently, another organization has those names and addresses, they aren't affected at all by what the Division of Motor Vehicles can do. So if the names and addresses have been obtained through other means and through DMV, are they protected? I don't think so. The problem is that the list of the names and addresses was derived from use of the PennDOT database. And the statute in the case law makes clear that where information is derived from PennDOT data, it remains protected. So even though that information may exist elsewhere, because the PennDOT data was used to arrive at that list, it's derivative, it's protected. And beyond that, the individuals themselves have privacy interests, serious privacy interests that are worthy of weighty protection in not being disclosed or named as persons who are only potentially non-citizens. Again, the statute's intended to protect and enhance the right to vote and encourage voting. And it would have just the opposite effect to allow an organization to publish reports, to name people who are only suspected of being non-citizens. And there's no database, there's no repository of information where it can be determined with certainty in real time whether someone is or is not a citizen. And allowing this type of information to be misused, to allow these people to be targeted, we contend violates their privacy interests. And for that additional reason, that information should be protected. Thank you, Counsel. Thank you, Your Honor. Thank you. You may proceed. Thank you. Excuse me, and may it please the Court. My name is Noel Johnson. I'm Counsel for the Public Interest Legal Foundation, which was the plaintiff below and the appellee cross-appellant here before this Court. Just a quick recap of the facts I think would be helpful here. For more than two decades, the Commonwealth added an unknown number of people to its voter rolls who were ineligible to vote. The Commonwealth, of course, deserves credit for trying to fix this mistake, but it does not get to do that in secret. That's what Congress decided. Congress believed that accurate voter information was so vital to the proper functioning of a democracy that it made all voterless maintenance records subject to public inspection. Congress wrote the disclosure provision precisely for situations like this. Yet for seven years, nearly seven years, the Commonwealth has fought transparency and is thwarting Congress's objectives. What do you want to do with this information? Our concern is with the activities of government. Congress wrote this statute so that the public, including my client, could analyze, study, and scrutinize the activities of government. That is primarily our concern. Would you say that again? Congress wrote this so that you could... So that the public could analyze, study, and scrutinize the voterless maintenance activities of the government. Well, certainly there is a disclosure provision in this statute, as there are in many statutes, but that doesn't mean that that's one of the purposes of the statute. Statutory purpose is really to enlarge the voter rolls. Isn't that correct? Well, Your Honor, that is one of the purposes. Another stated purpose by Congress was to keep accurate voter rolls and to protect the integrity of the electoral process. And disclosure, generally speaking, does exactly that. But it's not just disclosure. This isn't a disclosure statute for the sake of disclosure. It's so that the public can review this material, can understand what its government is doing, and scrutinize and hold them accountable. And in this instance, my client wishes to speak on a matter of public concern. And you mentioned and showed one of our reports there. That is something that we have in mind that we would like to do in this instance. We cannot because the Commonwealth is concealing many of these records. So what do you do about the Scott case, for instance? Went against you folks, I would think. It's not a good case for you. How do you distinguish it here? I think it's distinguishable for a number of reasons. First is the plaintiff in that case did allege, according to the court, injuries to the general public. Whereas in this case, we are alleging injuries specific to ourselves, our inability to scrutinize and analyze and report on, speak on, the activities of government. I think we need to look at what the Third Circuit has also said about transunion, which is different than what the Fifth Circuit has said about it. And you mentioned the Kelly versus Realpage decision. I don't think this court could have been clearer when it said the Supreme Court did not amend the informational injury doctrine in transunion. Rather, it simply applied its prior precedent. And so that means that the Supreme Court decisions we're relying on, the prior precedent, are both viable and controlling here. Well, but we said in Kelly that the interest that you have to contend has been harmed is the interest that is protected by the statute. And I see your desire to have this information for your own purposes is really not an interest protected by the statute, is it? Well, I think it is. I think we've alleged three downstream consequences. And I think I'd like to touch on two of them. One of them is the fact that this statute was created by Congress so that the public could enjoy a transparent election process, so that the government can be, so that Congress intended oversight, scrutiny, and accountability. We can't do exactly what Congress intended. And I would, but I would again refer you to public citizen where the Supreme Court stated that the inability to scrutinize the very activities that are the object of an open records law constitutes an injury that can support standing. And that's exactly what we have here. That was pre-transunion though. It was, it was. But I will again just refer you to the Kelly decision in which this court said that transunion did not amend the doctrine. It applied those prior precedents and it was citing public citizen and the Aikens decision. But it did acknowledge that there's something new, downstream consequences, so. I think it did. I think it provided clarity in that regard. But I think looking at transunion through the lens of the prior public disclosure cases, you see that one of those downstream consequences they had in mind in public disclosure cases is the inability to scrutinize the very activities that are the object of the open records law. But we don't just have. You mentioned a couple of times about the FDA opinion about how the Supreme Court said, well, just the purpose of a group doesn't necessarily get you over the threshold. How do you respond to that? Well, the Alliance case is distinguishable in that there you had a law of general applicability that just happened to adversely affect the plaintiff by its general operation. We have something very different here. We, of course, have a right to public records, which my client exercised. The Commonwealth then responded with a denial of that request. So it is the Commonwealth's action directed toward my client that has caused the injury here, as opposed to the Alliance case where the law of general applicability was adversely affecting the plaintiff simply by operating. Does your organization's work, I asked your adversary this as well, but your organization's work putting together that report based on the Allegheny County information disclosed pursuant to the MVRA, does that move the needle at all analytically here? Of course it does. I think one of the downstream consequences or the adverse effects here is our inability to speak about a matter of public concern and offer solutions. The inability to speak is a personal injury, whether somebody is listening or not. And we cannot do that here because we cannot view the records that the Commonwealth has created or relied on. So it absolutely does, it conclusively demonstrates the type of product that would result if we had access to this information, but we do not have that access, and therefore we are unable to speak. I do want to just briefly touch on the consequences of the Commonwealth's position here. They've taken the position that this disclosure obligation attaches only when the removal requirement is mandated by statute. Here, the requirement to remove deceased and relocated registrants. The consequences of that interpretation would be disastrous for transparency and for voters. It would mean the more the government departs from statute, the more it acts irregularly or even unlawfully, the less transparent the process becomes. Congress wrote this disclosure provision broadly to avoid that result. With respect to privacy, privacy is no doubt important, but Congress here, as the District Court realized, or recognized, prioritized transparency over privacy in crafting this broad disclosure requirement. I think that makes sense because this is a statute designed to protect voting rights. The Commonwealth, I think, shares that policy. Anybody with an email address and $20 can purchase a list of every registered voter in the state, including their personal information. And of course, the District Court did approve limited redactions, which we are not challenging. I do want to move on just briefly to the work product issue. As applied here, the work product doctrine essentially vetoes congressional legislation designed to protect the right to vote. Thousands of registered voters in the Commonwealth had their right to vote questioned, and the Commonwealth is concealing records that would allow us to understand whether that was justified or whether it was lawful. The Commonwealth's evidence, of course, deserves consideration, but it does not overcome the contemporary evidence on the other side of the ledger, which shows that from the very beginning, the Commonwealth was motivated primarily by a desire to fix a longstanding voterless maintenance mistake. And I think the affidavit of former Secretary Robert Torres is the best evidence of that. It shows three important things. It shows that the Commonwealth's expert analysis, or sorry, the Commonwealth's expert analysis was still evaluating the potential for litigation at the time it hired its expert. Evaluating whether litigation is likely is not the same as preparing for litigation, which is what's required for the protection to attach. The second thing it shows is that the Commonwealth took these actions to comply with federal and state voterless maintenance laws, which is a non-litigation purpose, which again would take these records outside the scope of the work product doctrine. And I think third, it shows that the Commonwealth would have taken these actions whether litigation was likely to ensue. Which again, takes these records outside the scope of the law, or scope of the work product protection. To find that the expert analysis had- I'm sorry, maybe I don't understand that last point. Are you saying that the Commonwealth would have done the same thing even if there was no risk of litigation at all? I don't know, yes, I am saying that. I think from the very beginning, when you back this up to the initial stages of the investigation, they were motivated by a desire to identify how many potential foreign nationals were registered to vote. In the second stage, they looked at how many foreign nationals had already been canceled. And then the only thing they hadn't done yet was look at how many foreign nationals were still registered to vote. That's the stage for which they- Or just a generalized risk that something might happen in the future. We're talking about work product privilege here, right? We are, and I think the only evidence that they've put forward to support that assertion is the affidavit, a self-serving affidavit, of Jonathan Marks, which simply describes this fear of litigation in the air. And the work product doctrine requires a more exacting and tailored analysis. Thank you, my time is up. Thank you, counsel. We'll hear from the United States. May it please the court, Noah Bocat-Lindell for the United States. I know a lot of the discussion this morning is centered around standing, and I'm afraid I can't offer you any help one way or the other on that because we haven't weighed in on standing. We're here to discuss the scope of Section 8I of the NBRA and the Secretary's arguments regarding that. And if I could, I'd like to make three basic points on that argument based on some of the discussion that's happened so far here today. The first, about the purposes of the statute. The second, about the Secretary's newer arguments about the scope. And third, about the privacy concerns. So first, there's been a lot of discussion this morning about the purposes of the NBRA and whether it's just about protecting voters. And we don't have to speculate about that. Congress placed the purposes of the statute in the text of the statute itself. In the first section, this is 52 U.S.C. 20501B, lists all four of the primary purposes of the statute. And two of those are about ensuring that more people are added to the voter rolls and become registered. And two of them are about, at the same time, preserving the integrity of the voter rolls. And Part 1B of the American Civil Rights Union decision from this court discusses those four purposes. So are you taking a position on standing or not? No, not at all. I'm just saying to the extent that this matters in terms of whether somehow they should not have access to these records under the statute because their purposes, PILF's purposes, are to ensure the accuracy of the voter rolls as opposed to just ensuring that more people are added to them, that that's not what the disclosure provision is dealing with. And the second point is about the Secretary's arguments that the statute, the disclosure provision, is limited to anything that the NBRA mandates or authorizes, or that it's limited to situations where people are taken on or off of the rolls. The problem with those arguments is that there's really no basis for them in the text of Section 8i. Section 8i does not depend on whether something is mandated by the statute, authorized by it, or prohibited by it. The only test that Section 8i sets out is what is the purpose for which programs or activities are being conducted? Are they being conducted for the purpose of ensuring the accuracy or the currency of the voter rolls? And I don't think at any point the Secretary in this litigation has denied that the purpose of these investigations was to ensure that the voter rolls are accurate to determine whether people who are not eligible to vote have in fact made it onto the voter rolls and sending out these letters to people asking them whether they are ineligible and suggesting that they cancel their registration. If Congress had wanted to limit it in the way that the Secretary suggests, they could have taken as a model a different subsection of Section 8. This is Section 8c2b Romanet 2. This is discussing the 90-day quiet period before an election where systematic voter removals are prohibited. And it says that's not limited, that doesn't apply to corrections pursuant to this chapter. So if they wanted to just say it's limited to activities that are allowed by the NVRA, they could have used language like that pursuant to this chapter or something like that. But they didn't. And as co-counsel pointed out, it is in fact in situations where states are violating the law or potentially violating the law that it would be most important to allow for disclosure. The Project Vote case out of the Fourth Circuit being a prime example where people were allegedly erroneously being prevented from registering to vote even though Section 8a1 of the NVRA requires states to allow eligible people to be registered to vote. And my final point is just about the privacy concerns that the Secretary has raised. In this case, we care very much about these privacy issues. We think that they're certainly legitimate. We just think that those concerns cannot allow for a warping of the text of the statute itself. And the First Circuit and the Fourth Circuit have both grappled with this issue expressly in their decisions. And they have come out the same way and said, look, the text is what it is. However, there are a number of ways in which these privacy concerns can be dealt with. Two of them prior to any information being brought out and two of them after they're brought out. I'll try to go through them very quickly. I recognize my time is running out. So prior to information coming out, a lot of states have laws like Pennsylvania's Address Confidentiality Program, which sets up a dummy address for people in certain situations, domestic violence, et cetera. In those instances, someone's real address wouldn't even be on the voter rolls to be disclosed in the first instance. Secondly, as other courts have recognized, redactions are possible for uniquely sensitive information that's either protected by other federal statutes, which of course have to be read harmoniously with the NVRA, or other compelling equitable concerns. And then if I, let me just quickly finish. On the back end, any state law that has a use or dissemination restriction on the information that does not frustrate the purposes of the NVRA is not preempted. And so states would be allowed to use those using dissemination restrictions. For instance, many states prohibit commercial use of this voter data. So someone can't turn around, take the data they got under the NVRA, and then sell it to other people. And then finally, federal and state laws, a number of them, both criminal and civil laws, prohibit voter intimidation. Both 18 U.S.C. 594 and a criminal provision of the NVRA itself prohibit voter intimidation. Pennsylvania has a voter, criminal voter intimidation statute that's 25. Pennsylvania statute section 3547. So all of those statutes are there to deter potential abuses of this authority and to punish people afterward. And states also can use anti-defamation laws, anti-hacking laws, other laws of that sort, none of which the NVRA prohibits. Thank you, counsel. And we'll hear rebuttal. Thank you, Your Honor. Just a few points. My friend on the other side spoke about list maintenance. This is not list maintenance. Pennsylvania has list maintenance programs pursuant to the NVRA and the Pennsylvania Voter Registration Act removes registrants. Wait, did you say list maintenance? List maintenance. List maintenance is the process by which persons who have died or changed residence, their names come off the voter rolls. That's something that's permitted by the NVRA, codified in Pennsylvania in the Pennsylvania Voter Registration Act. This isn't a list maintenance. This was a unique, unprecedented response to a unique, unprecedented problem, a glitch in the motor voter software system. And of course that, well, of course that takes us out of the range of ordinary business, ordinary course of business and ordinary list maintenance. I know that's why my adversary likes to call it that, but that's not what it is. This was an unprecedented, extraordinary issue. The department hired outside counsel who in turn hired a consulting expert that information was always kept confidential, never been disclosed, and the statute does nothing to intrude upon common law work product protection and statutory work product protection. And we have to consider that Congress, when it wrote the NVRA, it understood the privilege and work product and did nothing in the statute to attempt to retract or corral that or pull that back. Has this problem been solved totally? We believe that the problem, that the state did what it could within the scope of the NVRA and state law to address the problem in the best way possible. And why wouldn't you want an organization like PILF to help you solve it, to come up with ways to resolve it? Because the persons who receive these letters have not been determined to be non-citizens. And there is a serious, substantial risk of personal harm to them, harassment, threats, intimidation by just being identified and by their names being disclosed. They haven't been determined to be non-citizens and their privacy interests protect against disclosure of that information. Although we don't have any of those citizens in this litigation, do we? You are assuming that you should be fighting this fight for them. That's right. And all the courts that have considered the NVRA agree that there are privacy interests at stake and that information can be either redacted or withheld on that basis. So I think we're all consistent in that regard. A brief point, the Scott case was mentioned. This case is identical to Scott. The interest that was alleged there was an interest in transparency. So the public could know what happened. That's the same interest that's being alleged here. It wasn't there. In that case, specifically they said it's the interest of the public, the interest of the public. And that's not what they have contended here. I disagree. I believe that they, as a member of the public, are claiming that they have this interest in public disclosure of the information. And that's the same transparency interest that was not enough. With regard to the Tories' affidavit, just very quickly, what the affidavit says is that there was this problem. They hired counsel to seek legal advice and they were gonna rely on the advice of counsel. No suggestion that this was part of the ordinary course of business. And the Tories' affidavit is nothing to undermine the lower court's ruling with regard to the work product doctrine. We gave your friend another minute or so. If you had another point you wanted to make, you can go ahead. Sure, thank you, Your Honor. One last point. An argument was made that the First Amendment rights, inability to speak, was somehow implicated here. Again, if that's the case, then any person, any organization would have the ability to claim for itself and establish its own standing. And that's not what Article III permits. That's not what the case law permits or requires. Thank you, Your Honor. Thank you, counsel. And we thank all counsel for their excellent briefing and oral argument today. We'll take this case under advisement and go off the.